In the Matter of CITY OF NEW YORK, Relative to Acquiring Title to Real Property Required for Brooklyn-Battery Tunnel Plaza from Van Brunt to Hicks Streets, for Streets Adjacent Thereto and for Additional Lands in the Borough of Brooklyn.
In the Matter of FAR EASTERN MANUFACTURING Co., INC., Petitioner; CITY OF NEW YORK, Respondent.

Supreme Court, Special Term, Kings County, March 20, 1946.

604

*Frederick P. Rich* for petitioner.

*John J. Bennett, Corporation Counsel* (*Louis L. Funk* of counsel), for New York City Tunnel Authority.

LOCKWOOD, J. Twenty-one years ago, the president and sole stockholder of the petitioner, Far Eastern Manufacturing Co., Inc., an importer and processor of cocoanuts, purchased, and adapted for the exclusive use of his company, part of the Williams Drop Forge Works, the old four-story and basement building containing 24,000 square feet of floor space, known as Nos. 9–15 Richards Street, near Hamilton Avenue, Brooklyn.

Title to this and adjacent properties required for the Brooklyn-Battery Tunnel Plaza was duly vested in the City of New York on December 13, 1945, after which the occupants became tenants at will of the City, pursuant to section B15–37.0 of the Administrative Code of the City of New York, which reads: *" Vesting of title; effect of, upon real property contracts.—* a. Where the whole of any lot or parcel of real property, under lease or other contract, shall be taken, all the covenants, contracts and engagements between landlord and tenant or any other contracting parties touching the same, or any part thereof, upon the vesting of title in the city, shall cease and determine and be absolutely discharged. * * * b. All tenants in possession of such premises at the time of the vesting of title thereto in the city, where the real property affected was acquired in a capital project proceeding, shall become tenants at will of such city unless within ten days after the vesting of title they shall elect to vacate and give up their respective holdings.''

The Far Eastern Company was notified to vacate, as the building is on the part of the site which must now be cleared, if work on the tunnel project is to go forward.

On March 4, 1946, two months and nineteen days after vesting, and more than five years after work on the tunnel started within a few hundred feet of its factory, and four months after tunnel work was resumed, it instituted this proceeding to enjoin the city, its agents or authorities, from removing it as the tenant of said building.

Petitioner concedes that the city would have the right to possession under section B15–36.0 of the Administrative Code: *" Vesting of title; date of; seizin; possession.* * * * c. The city or any person acting under its authority, or the agency which upon the acquisition of title to such real property will have jurisdiction thereof, shall immediately or any time thereafter take possession of such property without suit or other

judicial proceedings '', except for the provisions of the Commercial Rent Law (L. 1945, ch: 3, as amd. by L. 1945, ch. 315, and as amd. by L. 1945, ch. 433) which provide: '' § 8. So long as the tenant continues to pay the rent to which the landlord is entitled  *  *  *  no tenant shall be removed from any commercial space, by action or proceeding to evict or to recover possession  *  *  *  unless:  *  *  *  (d)  *  *  *  possession is sought by a person who acquires title to the building subsequent to January twenty-fourth, nineteen hundred forty-five, and who likewise seeks in good faith to recover possession of the commercial space for his immediate and personal use; provided, however, that in either such event such person shall have an equity in the property of not less than twenty-five per centum of the purchase price; and provided, further, that nothing in this subdivision contained shall authorize the dispossession of a tenant during the term of his lease by his landlord or by any such subsequent purchaser unless by the terms of the lease the privilege is reserved to terminate the lease upon sale of the building; and provided further that no landlord shall be entitled to invoke the provisions of this subdivision unless he shall possess an interest of not less than fifty per centum of the whole investment in the business which he proposes to carry on in such space.  *  *  *  (f) The tenant occupies commercial space in a building required to be demolished in order to carry out a housing or rehabilitation project instituted under the public housing law, the redevelopment companies law, or section eighty-four of the insurance law, or instituted by a corporation organized under any law of this state for housing project purposes, the stock and obligations of which are owned by savings banks pursuant to subdivision twenty-one of section two hundred thirty-five of the banking law  *  *  *.''

Thus, the power to acquire and possess real property for a public use by the right of eminent domain is sought to be nullified by the provisions of a statute enacted in the exercise of the police power.

Petitioner argues that under the Commercial Rent Law (§ 8, quoted above), so long as it continues to pay the rent which the city is entitled to, under the provisions of the act, it may not be removed.

Further, to the extent that the provisions of the act are inconsistent with any general, specific or local law or charter provision, the act shall be controlling: '' § 14. To the extent that the provisions of this act are inconsistent with the provisions of any general, special or local law or charter provisions, the provi-

sions of this act shall be controlling. \* \* \* If any provisions of this act or the application thereof to any person or circumstance is held invalid the remainder of the act and the application of such provisions to other persons or circumstances shall not be affected thereby.''

Counsel concedes that the act includes special exceptions permitting the acquisition of property by the city for housing projects (§ 8, subd. [f]) but claims that it is silent concerning the rights of the city to acquire a building for the construction of a street plaza, tunnel purposes or any other kind of public project.

If petitioner's position were correct, it would mean that all public projects and improvements including those on which work was suspended during the war, except housing developments, would be held up during the emergency declared by the Commercial Rent Law, now to continue until July 1, 1946, but which will probably be extended at the present session of the Legislature.

The Brooklyn-Battery Tunnel is no new project. The congestions of commercial and pleasure vehicular traffic along the main streets of Brooklyn and to and along the water front with its many piers and thousands of manufacturing plants and other industries, and over the three existing bridges, reached the saturation point years ago.

This problem threatened the industrial life and prestige of our borough and the authorities, in 1929, directed their attention to its solution. Industries were moving or threatening to move to other States, which meant vacant buildings and employees moving away or becoming unemployed.

An over-all plan was adopted of which the Brooklyn-Battery Tunnel is the main link to Manhattan and via express highways there, to upper New York State, Connecticut and New England.

Chapter 1 of the Laws of 1936 authorized the construction of this tunnel. In 1939 the Legislature permitted the substitution of a bridge but it was disapproved by the War Department which veto was sustained by the President.

In May, 1940, money was appropriated and an agreement made to complete the tunnel and acquire lands for approaches and connections which specifically includes the parcel occupied by petitioner.

The Reconstruction Finance Corporation executed a contract with the New York City Tunnel Authority June 28, 1940, to advance a loan of not more than $57,000,000, on condition that the work progress without delay.

Actual construction work began October 29, 1940, by a ground-breaking ceremony attended by President Franklin Delano Roosevelt.

The R.F.C. advanced $10,000,000 up to the end of October, 1942, when tunnel construction work was suspended because of the war. Since that date, it has advanced a further $4,800,000. Tunnel work was resumed November 7, 1945.

From Brooklyn, the East Tunnel has progressed 1,456 feet; West Tunnel 1,205 feet; an average of 1,043 men are now employed. More are being put on the job. Hundreds of others are making material for tunnel use.

The contract for demolition work in Brooklyn was let March 1, 1946, and bids to clear the Brooklyn Plaza will be opened April 2, 1946.

This project has had the widest publicity for at least six years, in the public press, and by the distribution of thousands of booklets, including maps showing the area affected.

The tunnel shafts adjacent to petitioner's property have been there since 1940. All knew that work would be resumed with the ending of the war.

Furthermore, the city went ahead and completed the widening of Hamilton and Third Avenues, and of Hicks Street, and the construction of the Gowanus Highway from a point one block south of petitioner's property at a cost of over $20,000,000 and has plans to extend Hicks Street and also Prospect Avenue to give easy access to the tunnel and thus relieve traffic congestion in many parts of Brooklyn.

Thus, five or more years ago, the city took properties immediately to the northwest for the tunnel and the shaft, and also to the southwest for the widening of Hamilton Avenue. This taking of December 13, 1945, is comparatively small but most important, for the tunnels must have an entrance.

The structures affected by this plaza proceeding were erected many, many years ago. Some in the Worthington Pump Works dating from 1848 have been unused since Worthington moved to Harrison, New Jersey, forty-five years ago. Much of the old Williams Drop Forge plant adjacent to petitioner's property consists of standing walls only. Opposite petitioner are six abandoned old brick flats and along Hamilton Avenue are many boarded up three-story brick buildings.

Petitioner's vice-president testified here that in the summer of 1944 he had their counsel make inquiry as to when tunnel work would resume, and when they would have to move. Word came back that counsel could then learn of no definite date. Of

course not, the war was on and no one then knew when it would end.

All other businesses and the nine tenants remaining in the old houses have relocated, or seem to be solving their moving problems. No other tenant or owner joined in this application. The Office of Price Administration has granted a clearance. The city, through the relocation bureau is aiding the few families remaining to secure new places of residence. To date not one family has been evicted, and the plan is to so proceed with the work that such action will not be necessary.

The obvious purpose of the Commercial Rent Law is to prohibit the exaction of unjust and unreasonable rents during the declared emergency. The act contains provisions for the determination of reasonable rent and provides that no tenant shall be removed, so long as it continues to pay the rent to which the landlord is entitled under the provisions of the Act (§ 8).

The act does not provide that the city shall not be permitted to acquire property for a public improvement by eminent domain during the period of the housing emergency, nor can it be conceived that the Legislature intended to accomplish such a purpose by adopting an act to place a ceiling on rents.

The city took this property through the power of eminent domain, duly delegated to it by the State in the General City Law (§ 20, subd. 2), and specifically by the New York City Charter (1938) (§ 381), which provides: " The city may acquire title in fee to real property or any interest therein whenever required for any public or municipal use or purpose or for the promotion of public utility, comfort, health, enjoyment or adornment. Such title or interest shall be acquired according to law by purchase, condemnation or otherwise."

Such delegation is within the power of the State (*People ex rel. Burhans* v. *City of N. Y.*, 198 N. Y. 439).

In *Kahlen* v. *State of New York* (223 N. Y. 383, 391) the court said: " The right of eminent domain is an attribute of sovereignty which requires no constitutional recognition and is unrestricted except by constitutional limitations. (*Boom Co.* v. *Patterson*, 98 U. S. 403, 406.) It springs from the necessities of government."

In *Matter of City of Rochester* v. *Holden* (224 N. Y. 386, 391) the court stated: " The state has the inherent power to take the private property it requires for the use of the public, wherever it may be located, and in the taking may act directly or through a local agency authorized to exercise its power in whole

or in part." And on pages 392–393: " The power to take private property, contrary to the decision of the owner, for a public use reaches back of all constitutional provisions."

The court stated, in *United States* v. *A Certain Tract or Parcel of Land* (44 F. Supp. 712, 715): " The right or power of eminent domain is an attribute of sovereignty, inherent therein as a necessary and inseparable part thereof, and antedates, and therefore *exists independently of, constitutions and statutes.*" (Italics supplied.)

The only constitutional restrictions upon the power of eminent domain are those contained in section 6 of article I of the New York State Constitution: " No person shall be deprived of life, liberty or property without due process of law." And section 7 of article I provides: " Private property shall not be taken for public use without just compensation."

It is obvious therefore that the Legislature could not and did not intend to restrict or limit the inherent power of eminent domain by enaction of the Commercial Rent Law.

The right to " take " private property means the right to take not only the legal title, but also the physical possession of the property. It would be an empty gesture to take title to property for a public use without the right to possess and develop it for the public use.

Moreover, under the express provisions of the Commercial Rent Law itself, if it applied to this situation, the city would be entitled to remove petitioner (§ 8, subd. [d], quoted above).

The city acquired title to the property subsequent to January 24, 1945, and it seeks in good faith to recover possession of the space for its immediate and personal use.

The city has an equity in the property of over 25% of the purchase price, and has an interest of over 50% in the business which it proposes to carry on in such space. The lease affecting the property terminated upon the vesting of title in the city. (Administrative Code of City of New York, § B15–37.0.)

If it seems incongruous to classify the city as a landlord permitted to remove a tenant under the provisions of subdivision (d) of section 8, it is only because the act was never intended to apply when the city seeks possession of real property it has acquired by eminent domain for a public improvement.

The authorities want to retain this industry in Brooklyn and will grant as much time as possible, but on this record of long notice, it does not seem that work on the Brooklyn-Battery Tunnel should be shut down, several thousand men laid off, huge losses sustained and the R.F.C. loan perhaps jeopardized,

because one firm employing between ten and twenty people has been tardy and cannot find just what it wants in new space.

The court repeats the suggestion it made two weeks ago that this company seek the aid of the Brooklyn Chamber of Commerce in an effort to obtain new space.

Application denied.